**ESTATE OF Beverly W. POWELL,
John E. Lane, III, Executor,
Plaintiff,**

**v.**

**UNITED STATES of America,
Defendant.**

**No. 6:00CV0004.**

United States District Court,
W.D. Virginia,
Lynchburg Division.

July 30, 2001.

Joel Bron Miller, Wooten & Hart, P.C., Roanoke, VA, John E. Lane, III, Pro Se, Lynch Station, VA, for plaintiff/counter–defendant.

Julie C. Dudley, U.S. Attorney's Office, Roanoke, VA, Richard G. Jacobus, U.S. Department of Justice, Washington, DC, for defendant/counter–claimant.

## MEMORANDUM OPINION

MOON, District Judge.

The plaintiff, John E. Lane, as executor of the estate of Beverly W. Powell, commenced this action by filing a complaint in this Court seeking, *inter alia,* a refund of federal gift taxes allegedly overpaid by the late Mrs. Powell for the 1994 tax year, in the amount of $136,920 plus interest. In addition, the United States has set forth a counterclaim though which it seeks to recover allegedly erroneous income tax refunds issued for the 1992 and 1993 tax years. This dispute centers around $798,250.00 in payments made between 1988 and 1993 from Mrs. Powell's husband, the late Hampton O. Powell, to Jane Young. The primary point of contention between the parties is whether the payments were gifts or compensation for services.[1]

## I. FINDINGS OF BASIC FACT AS TO PLAINTIFF'S CLAIM [2]

### A. *Background Facts*

1. In this tax refund suit, the Estate of Beverly W. Powell, appearing by and through its Executor, John E. Lane, III, seeks a refund of federal gift taxes allegedly overpaid by the late Beverly W. Powell ("Mrs.Powell") for the 1994 tax year, in the amount of $136,920.00 plus interest according to law. Joint Stipulation of Facts ("Jt.Stip.") at ¶ 1.[3]

2. Mrs. Powell died on July 27, 1995, her late husband, Hampton O. Powell ("Mr.Powell"), having predeceased her on June 25, 1994. Jt. Stip. at ¶ 2.

3. Mr. Powell was formerly the Chief Executive Officer of the Lane Company, a major furniture manufacturer headquartered in Altavista, Virginia. Jt. Stip. at ¶ 3.

4. Mr. Powell was decisive and a man of his word, traits which served him well in his career at the Lane Company. Tr. 317 (Young).

5. While at the Lane Company, Mr. Powell exercised employee hiring and firing authority, including decisions regarding employee compensation. Jt. Stip. at ¶ 4. For example, he had to approve all annual salary increases for everyone working in the Lane Company's offices. Tr. 316 (Young).

6. Mr. Powell retired from the Lane Company in 1984. Jt. Stip. at ¶ 6.

7. Jane Young (a/k/a Jane Hudson, a/k/a Jane Hudson–Young) ("Mrs.Young") was employed by the Lane Company from 1956 through 1989, working from 1958 until 1984 as Mr. Powell's executive secretary. Jt. Stip. at ¶ 8.

8. While employed as Mr. Powell's executive secretary, Mrs. Young handled Mr. Powell's personal and financial affairs that he was unable to attend to because of business travel commitments, including his

---

1. The findings of fact and analysis in this memorandum opinion were constructed primarily from proposed findings of fact and conclusions of law submitted by the parties. The Court commends both sides for their efforts.

2. Parts I and II herein correspond to the two-part factual inquiry that applies in gift v. compensation cases:

> First, [in determining whether a payment was a gift or compensation] the trier of fact must make findings as to the basic facts, the actual happenings.... Second, the trier of fact must draw from these basic findings his inferences as to the "dominant reason" for the payments-the answer to the question why the payments were made.

> *Poyner v. Commissioner,* 301 F.2d 287, 289 (4th Cir.1962).

3. By order entered February 20, 2001, the Court adopted the findings set forth in the parties' Joint Stipulation as its findings of undisputed fact pursuant to Rule 56(d) of the Federal Rules of Civil Procedure.

personal correspondence, telephone calls to his stockbrokers to place trades at his direction, record keeping with respect to his investments, income, and expenses, and the preparation of Mr. and Mrs. Powell's tax returns. Jt. Stip. at ¶ 9. In 1976, Mrs. Young studied tax materials and passed a tax course exam, earning credits thereby, without having to take a tax course at Central Virginia Community College. Jt. Stip. at ¶ 10.

9. Apart from occasional larger projects, such as preparing an income tax return, Mrs. Young devoted five percent (5%) or less of her work week at the Lane Company, on average, to Mr. Powell's personal and financial affairs. Tr. 309–310 (Young).

10. Mrs. Young's salary at the Lane Company began at $200 per month in 1956 and increased to approximately $30,000 or $31,000 per annum, prior to her retirement in March of 1989. Jt. Stip. at ¶ 18.

11. Mr. Powell was very private about his personal finances and did not like people meddling in his affairs. For example, with the exception of Jim Wheat and Jane Brooke, his stockbrokers at Wheat First Securities, Mr. Powell had a lifelong distrust of attorneys, accountants, and others who might seek to involve themselves in his personal and financial affairs. Throughout Mr. Powell's life, he and Mrs. Powell consistently refused to seek any advice from attorneys or accountants regarding tax and estate planning. Instead, Mr. Powell relied exclusively upon Mrs. Young to prepare his tax returns. Moreover, although Mr. Powell accepted advice from Mr. Wheat and Ms. Brooke on investment matters, Mr. Powell set the criteria for what investments the Wheat firm were

to make on his behalf. Jt. Stip. at ¶ 36; Tr. 195 (Carr); Defendant's Trial Exhibit ("DX") 2 at 10, 35–36, 74–77, 103–104 (Brooke); DX 39 at 4 (Young);[4] DX 42 at 3, 5 (Young).

12. While getting Mr. and Mrs. Powell to turn over their records in an organized manner was problematic (Tr. 250–251, 308), Mrs. Young did not find the tax returns themselves difficult to prepare; rather, the Powells' tax returns were "pretty cut and dry." Tr. 282 (Young).

13. Mr. Wheat served on the board of directors of the Lane Company during Mr. Powell's tenure with that company. By reason of that relationship, Mr. Wheat's assistant, Ms. Brooke, became acquainted with Mr. Powell in 1973. Mr. Wheat and Ms. Brooke met routinely with Mr. Powell on a quarterly basis, when they traveled to Altavista, Virginia, for Lane Company board meetings. Jt. Stip. at ¶ 37.

*B. Mr. Powell's Exceptional Generosity*

14. Hampton Powell was a generous man. Tr. 194 (Carr), 316 (Young). Giving was Mr. Powell's primary pleasure in life, and he displayed evident pleasure when he perceived that the recipient was pleased with the gift. Tr. 347 (Young).

15. Throughout his life, Mr. Powell frequently made substantial gifts to churches, schools, charities, family members, and friends. Tr. 316 (Young); DX 19; Jt. Stip. at ¶ 40. In particular, prior to 1988, Mr. Powell made annual transfers of Lane Company stock to churches, charities, family members, and Mrs. Young each Christmas season. Toward that end, Mr. Powell would prepare handwritten "Christmas

4. DX 39, admitted by stipulation of the parties, is Mrs. Young's letter dated July 31, 2000, wherein she recounts various "anecdotes and vignettes" that summarize her long friendship with Mr. Powell and his many generous acts on her behalf over the years. Mrs. Young wrote this letter on her own initiative, in order to refresh her memory in preparation for her deposition of August 29–30, 2000. Tr. 339–340; DX 39.

lists" enumerating each stock transfer and the respective donees. Jt. Stip. at 41; DX 19 (Mr. Powell's 1969–1975, 1977–1980, and 1982–1986 "Christmas lists"); Tr. 195–196 (Carr).

16. Mr. and Mrs. Powell made the following gifts to charity in 1983 through 1993 (Jt. Stip. at ¶ 40):

| 1983 | $ 87,243.85 |
|---|---|
| 1984 | 93,431.65 |
| 1985 | 133,144.00 |
| 1986 | 144,947.70 |
| 1987 | 84,250.00 |
| 1988 | 195,535.00 |
| 1989 | 324,989.00 |
| 1990 | 309,613.00 |
| 1991 | 363,860.00 |
| 1992 | 250,524.00 |
| 1993 | 856,167.00 |

17. Mr. Powell's Christmas giving to individual donees was routine and habitual; he made similar gifts each year-end to the same people, including Mrs. Young, with few changes, year in and year out. DX 19; DX 41 at 4–5 (Young). Set forth below are Mr. Powell's gifts of Lane Company stock to Mrs. Young during the years 1966 through 1986, as enumerated in his annual "Christmas lists" and Virginia gift tax returns:

| Year | Number of Shares | Value |
|---|---|---|
| 1986 | 200 | NA[5] |
| 1985 | 200 | NA |
| 1984 | 275 | NA |
| 1983 | 165 | NA |
| 1982 | 150 | NA |
| 1981 | 150 | NA |
| 1980 | 110 | NA |
| 1979 | 125 | $3,000 |
| 1978 | 150 | 3,000 |
| 1977 | 150 | NA |
| 1976 | 150 | 3,000 |
| 1975 | 150 | 2,800 |
| 1974 | 200 | 2,150 |
| 1973 | 150 | 2,662 |
| 1972 | 150 | 4,875 |
| 1971 | 150 | 6,300 |
| 1970 | 200 | 6,150 |
| 1969 | 150 | 5,175 |
| 1968 | 125 | 5,687 |
| 1967 | 100 | 2,700 |
| 1966 | 100 | 1,725 |

Jt. Stip. at ¶¶ 42–43.

18. It was also Mr. Powell's consistent practice, for many years, to give shares of Lane Company stock in equal amounts to Mrs. Powell; his sister, Elizabeth Carr; and Mrs. Young as Christmas gifts. DX 19; Tr. 194–196 (Carr); Jt. Stip. at ¶ 45.

19. Over the years, Mr. Powell also made "myriad gifts far too numerous to list" to Mrs. Young, in the form of clothing, jewelry, perfume, candy, collectibles, and housewares, etc. DX 39 at 1; Tr. 340 (Young).

20. Mr. Powell was not content with making gifts to Mrs. Young only on such occasions as Christmas, Thanksgiving, Easter, and birthdays; rather, he looked for opportunities to give throughout the year. DX 39 at 1.

21. Mr. Powell was a compulsive shopper, and loved to shop for the purpose of making gifts to others. For example, he would routinely do his Christmas shopping by obtaining dozens of catalogs from which he ordered gifts such as cakes, candies, hams, and the like. Tr. 196–197 (Carr), 340, 349 (Young); DX 39 at 1–2 (Young); see Tr. 346–347 (Young) (stating that "he bought such quantities of things and gave so excessively, I mean unbelievably so").

22. In addition, Mr. Powell frequently bought things when he was on business trips and shipped those items back home as gifts for others. Tr. 196–197 (Carr), 340 (Young). Mr. Powell made those purchases in threes—one for Mrs. Powell, one for Mrs. Carr, and one for Mrs. Young. For example, while on one business trip to New York, upon seeing a large silver bowl

5. Not available, but can be estimated to an amount equal or less than the annual exclusion amount for taxable gifts.

in a store that he liked, Mr. Powell bought three such bowls, one for each of them. Tr. 196–197 (Carr), 346–347 (Young); DX 39 at 1 (Young).

23. Consistent with his spontaneous gift giving, Mr. Powell was also an impulsive investor and stock trader, sometimes to his own disadvantage. Jt. Stip. at ¶ 10A.

### C. The Interco Stock Sale and Its Aftermath

24. During his lengthy career at the Lane Company, Mr. Powell amassed substantial wealth, primarily in the form of Lane Company stock. Jt. Stip. at ¶ 19.

25. As a consequence of the acquisition of the Lane Company by Interco in the mid–1980s, the Lane Company's stock was converted to Interco stock. Jt. Stip. at ¶ 20.

26. In late 1988, several years after his retirement, Mr. Powell sold all of his Interco stock for almost $18 million. Jt. Stip. at ¶ 21. At that time, Mrs. Powell also sold all of her Interco stock, all of which Mr. Powell had given to her over the years, for approximately $3.25 million. Jt. Stip. at ¶ 22.

27. Due to concerns over Interco's future business prospects, Jane Young, John Lane, and Jim Wheat of Wheat First Securities advised Mr. and Mrs. Powell to sell their Interco stock. Given his long association with the Lane Company, Mr. Powell was reluctant to part with his Interco stock, but Mrs. Young persuaded him to do so at the last minute before a deadline passed. Jt. Stip. at ¶ 23.

28. Subsequent to Mr. Powell's sale of his Interco stock, Interco went into bankruptcy. Jt. Stip. at ¶ 24.

29. After the fact, Mr. Powell was pleased that he had sold his Interco stock before that company entered bankruptcy proceedings and was grateful to Mrs. Young for the role she played in persuading him to sell that stock. For example, on one occasion, Mr. Powell informed Jane Brooke of Wheat First Securities that "I'd be broke if it weren't for Jane [Young]." Jt. Stip. at ¶ 25; DX 41 at 3 (Young).

30. During 1989, Mr. and Mrs. Powell's Interco stock sale proceeds were reinvested in "laddered bond portfolios" consisting largely of tax-exempt bonds. Jt. Stip. at ¶ 31.

31. Although by 1989 Jane Brooke was the primary broker on the Powells' Wheat First Securities brokerage accounts (Jt. Stip. at ¶ 30), Mr. Powell continued to deal directly with Jim Wheat on most matters until Mr. Wheat's death in April of 1991. Tr. 241 (Young); DX 2 at 18 (Brooke). Moreover, Mr. Wheat was primarily responsible for helping the Powells reinvest the Interco stock sale proceeds in 1989, in that he designed and created the Powells' laddered bond portfolios. Tr. 350–351 (Young).

32. Notwithstanding his predominant role in the 1989 reinvestment project, Mr. Wheat generously shared credit for the results with Ms. Brooke and Mrs. Young. Tr. 255–256 (Young); Plaintiff's Trial Exhibit ("PX") 51.

33. Mr. Powell established criteria for the Powells' laddered bond portfolios, focusing on tax-exempt bonds, and trusted the Wheat firm to carry out his wishes. Thus, following Mr. Powell's instructions, the Wheat firm purchased bonds for the Powells' accounts without seeking specific authorization for each and every bond purchase. Tr. 241 (Young); DX 2 at 33–36 (Brooke).

34. Mrs. Young does not hold a stockbroker's license and has no education in investment portfolio management. Tr. 352 (Young). Because she had no expertise in such matters, Mrs. Young's role in the

1989 reinvestment process, and in the subsequent administration of the Powells' Wheat First Securities investment accounts, was limited to that of a "middleman" or "go-between" who relayed communications between the Powells and the Wheat firm, which provided the requisite technical investment expertise. Tr. 350 (Young); DX 2 at 25, 33–35, 39 (Brooke).

### D. Jane Young's Relations with Mr. and Mrs. Powell

35. Mr. and Mrs. Powell had no children. Jt. Stip. at ¶ 60.

36. Jane Brooke perceived that Mr. Powell viewed Mrs. Young as he would a daughter. DX 2 at 105; DX 2 at A, page 1.

37. That Mr. Powell viewed Mrs. Young like a family member can be inferred from his frequent practice of making equal gifts to Mrs. Powell, Mrs. Carr, and Mrs. Young.

38. Throughout their long association, Mr. Powell took a fatherly interest in Mrs. Young's life, career, and family, including her son and two grandsons. DX 39 at 2–4 (Young).

39. Mr. Powell was very fond of Mrs. Young's son and two grandsons, and showed a fatherly/grandfatherly interest in those boys for as long as he lived. Tr. 340–341 (Young). For example, Mr. Powell kept Mrs. Young's grandsons' school pictures on his bathroom mirror for many years. Also, just as he did with the children in his own family,[6] Mr. Powell began making gifts, which he termed a "college nest egg" or a "college fund," to Mrs. Young's son and grandsons when they were at an early age. Mr. Powell also gave those boys savings bonds at Christmas and gifts of cash whenever he saw

them. Mrs. Young's son and grandsons enjoyed visiting Mr. Powell because he was playful and a great storyteller. Tr. 341 (Young); DX 39 at 1–2 (Young).

40. Mr. Powell showed great concern whenever illness or death struck Mrs. Young's family. On occasions when Mrs. Young was hospitalized, Mr. and Mrs. Powell always came to visit her. For example, when Mrs. Young had an emergency appendectomy, the first people she saw upon awakening were the Powells, standing beside her hospital bed. After Mrs. Young's father died, Mr. Powell put Mrs. Young's mother on the list of elderly and widowed persons whom he helped regularly with monetary gifts. When Mrs. Young's first husband died suddenly of a heart attack, Mr. Powell immediately drove home from a business meeting in High Point, North Carolina, and he and Mrs. Powell paid a visit to Mrs. Young's home in a matter of hours. DX 39 at 2 (Young).

41. When Mrs. Young and her first husband bought a house, Mr. Powell co-signed a bank loan for their down payment. DX 39 at 3 (Young).

42. Mr. Powell regularly brought Mrs. Young roses and vegetables from his home garden. DX 39 at 3 (Young).

43. Mr. Powell took great interest in Mrs. Young's personal activities away from the Lane Company, including various "moonlighting" endeavors that she pursued to supplement her income. Mr. Powell lent his encouragement and support to Mrs. Young's sales of cosmetics and exercise machines, her writing as a correspondent for the Lynchburg News, her part-time work as a licensed real estate broker, an investment in real estate in Myrtle Beach, South Carolina, her successful ef-

---

**6.** While the record is unclear on this point, though childless, the Powells evidently had nieces and nephews.

forts to become the first secretary in the Lynchburg area to pass the Certified Professional Secretary examination, her role in a local Little Theater play, and her candidacy for the Altavista Town Council. DX 39 at 3 (Young).

44. Mrs. Young viewed Mr. Powell as a father and the best friend she ever had. Tr. 338.

45. In his last years, Mr. Powell often asked Mrs. Young to promise that she would look after things for Mrs. Powell after his death. Because she loved Mr. Powell as a father, and was deeply grateful for everything he had done for her over the years, Mrs. Young did not hesitate to make that promise. DX 39 at 4 (Young).

46. Out of love and affection for Mr. Powell, Mrs. Young continued to help with his personal finances after his retirement in 1984, just as she provided similar assistance, without compensation, to her own elderly parents, her widowed mother-in-law, and her great-uncle's widow. DX 39 at 4–5 (Young). As with her own aged family members, Mrs. Young never expected to be paid for the help she gave Mr. Powell in his declining years, and told the Powells so. DX 41 at 3 (Young); DX 42 at 14 (Young).

47. During the last five years of Mr. Powell's life, Mr. and Mrs. Young visited Mr. Powell whenever he was in the hospital. On those occasions, Mr. Powell was pleased to see Mr. and Mrs. Young, and asked many questions about the children, Mr. Young's job, and the Lane Company in general. Tr. 341–342 (Young).

48. During the 1988–1993 time frame, Mrs. Young visited the Powell home every month or two to discuss their finances with them. Tr. 342 (Young). Mrs. Young's visits had social aspects as well, in that she welcomed the opportunity to see Mr. Powell. Tr. 342 (Young) ("Getting the monthly report from Wheat gave me an excuse to call to go for a visit."). During these visits, Mrs. Young and the Powells sat in the Powell family room and enjoyed ordinary social conversation. Tr. 343–344 (Young). However, Mrs. Young's ability to visit Mr. Powell at home was somewhat more restricted than her hospital visits, because Mrs. Powell was very protective of Mr. Powell whenever he did not feel well. Tr. 342 (Young).

49. Over the years, Mrs. Young and Mrs. Powell enjoyed good relations. Whenever Mr. Powell was out of town on business travel, Mrs. Powell would engage Mrs. Young in many lengthy telephone conversations. Mrs. Powell displayed fondness not only toward Mrs. Young, but also Mrs. Young's son and two grandsons. Tr. 353 (Young); DX 2 at 71–74 (Brooke); DX 2 at A, page 3 (Brooke).

50. Mrs. Young recalls only one occasion when her relations with Mrs. Powell grew strained. Specifically, in 1990 or 1991, Mrs. Powell grew upset when Mr. Powell, with Mrs. Young's assistance, explored the idea of placing some of his assets in trust for various beneficiaries (including Mrs. Powell), rather than leaving his wealth solely to Mrs. Powell. Tr. 275–278 (Young). Consistent with his life-long aversion to legal matters, Mr. Powell considered this idea only briefly and never followed up on it. Tr. 277 (Young); DX 42 at 6 (Young). After Mr. Powell's lack of serious interest in the trust idea became apparent, Mrs. Powell resumed friendly relations with Mrs. Young. Tr. 353–354 (Young).

51. Mrs. Powell and Mrs. Young continued to enjoy a cordial relationship after Mr. Powell's death. For example, Mrs. Powell's letters to Mrs. Young in that time frame reflect a friendly tone. Tr. 354 (Young); DX 48–50.

52. About one month before Mrs. Powell's death, Mrs. Young and her husband enjoyed a cordial visit with Mrs. Powell in the Powell home. Tr. 355 (Young).

### E. Mr. Powell's Intentions Upon Making the Contested Payments

53. Before selling his Interco stock in late 1988 for almost $18 million, Mr. Powell had never possessed that amount of cash. Jt. Stip. at ¶ 26.

54. After selling his Interco stock in late 1988, Mr. Powell made the following gifts (the "Contested Payments") to Mrs. Young in the years 1988 through 1993 (Jt. Stip. at ¶ 47):

| | |
|---|---|
| December 1988 (cash) | $100,000 |
| April 1989 (Conrail stock) | $ 98,250 |
| May 1989 (cash) | 100,000 |
| December 1989 (cash) | 100,000 |
| Total 1989 | 298,250 |
| December 1990 (cash) | 100,000 |
| December 1991 (cash) | 100,000 |
| December 1992 (cash) | 100,000 |
| December 1993 (cash) | 100,000 |
| Total 1988–1993 payments | $798,250 |

55. Prior to 1988, Mr. Powell made annual gifts to Mrs. Young and other individual donees in amounts less than the annual exclusion amount of $10,000,[7] in order to avoid filing federal gift tax returns. However, after selling his Interco stock in late 1988, Mr. Powell was unconcerned about gift taxes and, having a large and unprecedented sum of cash, was more interested in doing what he wanted to do in terms of sharing his wealth in his final years. Jt. Stip. at ¶ 59; DX 41.

56. As with the sharp increase in Mr. Powell's charitable giving after the sale of his Interco stock in late 1988, the increase in the dollar amounts of Mr. Powell's gifts to Mrs. Young in 1988 through 1993 was attributable to the large and unprecedented amount of cash that Mr. Powell realized from the Interco stock sale.

57. All of Mr. Powell's payments to Mrs. Young during the years 1988 through 1992 were made pursuant to Letters of Authorization (LOAs) signed by Mr. Powell, whereby Wheat First Securities was directed to transfer the pertinent amounts to Mrs. Young. Jt. Stip. at ¶ 49.

58. Due to his declining health, Mr. Powell's payment to Mrs. Young in December of 1993 was made pursuant to an LOA signed by Mrs. Powell on Mr. Powell's behalf under a power of attorney. Jt. Stip. at ¶ 50.

59. When Mrs. Powell executed the LOA authorizing the December 1993 payment to Mrs. Young, she informed Mrs. Young that she would continue Mr. Powell's Christmas giving practices for as long as he was still alive, but due to Mr. Powell's failing health, Mrs. Powell also stated that the 1993 payment would probably be the last. Jt. Stip. at ¶ 51.

60. Each of the foregoing LOAs states that Mr. Powell made each payment to Mrs. Young as a "gift." Jt. Stip. at ¶ 52; DX 1 (the LOAs).

61. Upon making the first Contested Payment of $100,000 in December 1988, Mr. Powell informed Ms. Brooke by telephone that he wanted to make that payment as a "gift" to Mrs. Young DX 2 at 55–56 (Brooke). Mr. Powell characterized each of the six year-end Contested Payments as his annual Christmas gift to Mrs. Young, and continued his practice of making year-end gifts to Mrs. Powell and Mrs. Young in equal amounts. Jt. Stip. at ¶ 46; Tr. 286, 319–320 (Young).

62. In April 1989, Mr. Powell bought several thousand shares of Conrail stock on Jim Wheat's advice, then decided to give 3,000 shares each to Mrs. Young and Mrs. Powell.[8] DX 41 at 3 (Young); DX 42 at 11–12 (Young); DX 2 at 52–53 (Brooke);

---

7. *See* 26 U.S.C. § 2503(b) (excluding gifts of $10,000 per year per donee from the gift tax).

8. Although the parties have stipulated that no similar transfer of Conrail stock was made to Mrs. Powell, it appears to the Court that Mr. Powell meant to make a matching gift to Mrs.

DX 2 at A, page 2 (Brooke). Mr. Powell informed Mrs. Young that the Conrail stock was a gift. Tr. 320–321 (Young). He also informed Ms. Brooke by telephone that he wanted to make a gift of Conrail stock to Mrs. Young, and expressly used the specific term "gift" on that occasion. Jt. Stip. at ¶ 53; DX 2 at 52; DX 2 at A, page 2.

63. Regarding Mr. Powell's payment of $100,000 cash to Mrs. Young in May of 1989, Mr. Powell was expecting to receive the proceeds from the disposition of his stock in CAMAC, a privately held company that was liquidating. Because the liquidation proceeds would have triggered a large capital gains tax liability, Jim Wheat advised Mr. Powell to give the shares to charity. Mr. Powell briefly dabbled with the idea of giving some of the shares to charity and some of the shares to Mrs. Young, at which time she cited his recent gift of Conrail stock and told Mr. Powell that he need not give her anything else. Ultimately, Mr. Powell gave most of his CAMAC stock to charity, sold the rest, and made a $100,000 cash gift to Mrs. Young from the sale proceeds. Tr. 287 (Young); DX 41 at 3–4 (Young); DX 42 at 11–12 (Young). Mr. Powell told Mrs. Young: "I just want you to have this as a nest egg." Tr. 321 (Young). He also informed Ms. Brooke by telephone that he wanted to make another gift to Mrs. Young, and expressly used the specific term "gift" on that occasion. Jt. Stip. at ¶ 54; DX 2 at 57–59 (Brooke); DX 2 at A, page 2 (Brooke).

64. From the ad hoc manner in which Mr. Powell gave the Conrail stock and $100,000 cash to Mrs. Young in April and May 1989, the Court, as fact finder, can readily infer that those two Contested Payments were manifestations of his impulsive, spontaneous generosity.

65. Upon making the gifts of Conrail stock and $100,000 cash to Mrs. Young in April and May 1989, Mr. Powell was motivated by two specific considerations beyond his customary generosity. First, in light of Mrs. Young's widowhood and recent retirement in March of 1989, Mr. Powell was concerned for her future well-being. Second, mindful that Mrs. Young had recently persuaded him to sell his Interco stock before Interco entered bankruptcy, Mr. Powell was grateful for Mrs. Young's timely advice. His gratitude was also a motivating factor in the first Contested Payment in December 1988. Tr. 321 (Young); DX 41 at 3–4 (Young); DX 42 at 13 (Young); DX 2 at 56 (Brooke).

66. Mr. Powell filed federal gift tax returns (Forms 709) for the years 1988 through 1993, reporting his payments to Mrs. Young during those years as gifts, and paid the resultant gift taxes. Mr. Powell signed each of his 1988 through 1992 gift tax returns, but due to his declining health, Mrs. Powell signed the 1993 gift tax return on his behalf, pursuant to a power of attorney. Jt. Stip. at ¶ 56; DX 3–8.

67. Mrs. Powell also separately signed each of Mr. Powell's 1989 through 1993 federal gift tax returns, in order to express her consent to treat one-half of Mr. Powell's payments to Mrs. Young in those years as having been made by Mrs. Powell for federal gift tax purposes, i.e., a "gift-splitting" election.[9] Jt. Stip. at ¶ 57; DX 3–8.

---

Powell, even though the transaction eventually failed to take place.

9. The gift-splitting election under 26 C.F.R. § 25.2513–1 allows a husband and wife to treat gifts made by one spouse to third persons as having been made one-half by each spouse. This has the effect of doubling the $10,000 annual gift tax exclusion under § 2503(b) to $20,000, i.e., $10,000 for each spouse, with respect to each third person donee.

68. Because she considered the Contested Payments to be gifts from Mr. Powell, Mrs. Young did not report those payments on her own 1988–1993 federal income tax returns. Tr. 290–292, 295 (Young).

69. Although Mr. and Mrs. Powell understood that once their annual gifts to a particular donee exceeded the sum of $10,000 they would be required to file a federal gift tax return, the Powells never questioned Mrs. Young about the propriety of filing gift tax returns for the years 1988 through 1993. Tr. 292, 323–324 (Young); DX 42 at 12 (Young).

70. After Mr. Powell died in June of 1994, Mrs. Powell engaged John Lane, III, to advise her regarding the administration of Mr. Powell's estate, as well as her own tax and estate planning. Jt. Stip. at ¶ 66.

71. Shortly after Mr. Lane was engaged by Mrs. Powell in mid-1994, at Mrs. Powell's request, Mrs. Young turned over to Mr. Lane all of the documents and files relating to Mr. Powell's finances that she had accumulated over the years. Jt. Stip. at ¶ 67.

72. In August of 1994, on Mr. Lane's advice and with the assistance of the firm of Hicks and Hicks, Certified Public Accountants, of Altavista, Virginia, Mrs. Powell filed amended gift tax returns on behalf of the late Mr. Powell for the years 1989 through 1993, as well as original gift tax returns on her own behalf for those years. Those "first round" amended gift tax returns and Mrs. Powell's original 1989–1993 gift tax returns were filed to correct technical defects in Mr. and Mrs. Powell's "gift-splitting" election. However, the "first round" amended gift tax returns filed on behalf of the late Mr. Powell, all of which were signed by Mrs. Powell in her capacity as the administratrix of Mr. Powell's estate, continued to reflect all of the Contested Payments as gifts. Jt. Stip. at ¶ 68; Tr. 26–29 (Hicks).

73. The only understanding that Mrs. Young ever had concerning the Contested Payments was that Mr. Powell made those payments out of love and affection. Tr. 314 (Young).

74. Based on her long association with Mr. Powell, Mrs. Young believes that Mr. Powell would never have contemplated paying anyone $100,000 a year or more for *any* services, let alone the help she gave him in his declining years. Tr. 314 (Young). On the contrary, in light of Mr. Powell's extensive business experience, his decisive nature, and his long history of making substantial gifts to both charities and individual donees, Mrs. Young believes that Mr. Powell plainly knew the difference between a paycheck and a gift, and the Court finds this to be the case. Tr. 319 (Young).

*F. Jane Young's Assistance to Mr. Powell in his Declining Years*

75. When Mr. Powell retired in 1984, Mrs. Young assumed other duties with the National Accounts Division of the sales department at the Lane Company, but she continued to assist Mr. Powell with his personal and financial affairs, with the exception of checks drawn on Mr. Powell's First National Bank of Altavista account, which Mrs. Powell handled. Jt. Stip. at ¶ 11; Tr. 347–348 (Young); DX 42 at 10 (Young); DX 47.

76. Upon Mr. Powell's retirement in 1984, Mrs. Young wrote a memorandum to Stuart Moore, Mr. Powell's successor as CEO of the Lane Company, explaining the nature of the help she gave Mr. Powell with his personal finances. Mr. Moore was willing to let Mrs. Young continue helping Mr. Powell, but wanted to know how much time would be involved. Tr. 247–248, 303–304 (Young). In her 1984 memo, Mrs. Young sought to make the list of her activities on Mr. Powell's behalf

"really seem big," because she wanted the Lane Company to continue allowing her enough time to help Mr. Powell. Tr. 251; PX 34.

77. On May 6, 1986, when Mrs. Young was being reassigned to another full-time position at the Lane Company, she obtained her 1984 memo to Mr. Moore from the computer and readdressed that memo to Mr. Powell, adding some suggestions for simplifying the administration of Mr. Powell's finances. Tr. 247–250 (Young); PX 34. Knowing that she would thereafter have to help with his finances on her own time after business hours, and aware of the Powells' disorganized approach to their financial and tax record keeping, Mrs. Young suggested in her May 6, 1986 memo to Mr. Powell: "Just let me be your accountant and spare your having to fret with any of it." PX 34; Tr. 250–251 (Young). In making this suggestion, Mrs. Young was not soliciting pay from Mr. Powell; rather, she invited the Powells to turn over their paperwork to her for efficiency's sake. Tr. 311–312 (Young).

78. Mr. Powell never represented to Mrs. Young that he viewed her statement, "Just let me be your accountant," to constitute a solicitation of pay. Tr. 312 (Young). Indeed, after his retirement in 1984, Mr. Powell never suggested to Mrs. Young that he would make future payments to her in anticipation of her continued assistance with his personal finances, nor did he ever suggest to Mrs. Young that the Contested Payments were intended as compensation for services rendered. Tr. 313 (Young). In fact, Mr. Powell and Mrs. Young never negotiated any exchange of money for services. Tr. 313 (Young).

79. Similarly, there is no known connection between Mrs. Young's memo of May 6, 1986 and the first Contested Payment in December 1988, over two and one-half years later.

80. Mrs. Young's memo of May 6, 1986 (PX 34) somewhat overstates her time commitment to Mr. Powell's personal affairs at that time, listing certain activities that were no longer necessary after his retirement in 1984. Specifically, because Mr. Powell was retired, Mrs. Young no longer had to handle his business-related travel, correspondence, and telephone calls. Tr. 251–252, 347–348 (Young). Apart from the foregoing, Mrs. Young's memo of May 6, 1986 accurately depicts the nature of the help she was providing to Mr. Powell as of 1986. Tr. 304–305 (Young).

81. After retiring from the Lane Company in March 1989, Mrs. Young helped Mr. Powell with his personal finances in her spare time at home, continuing these activities until Mr. Powell's death in June of 1994. Jt. Stip. at ¶¶ 13A, 14.

82. Mrs. Young also helped with some of Mrs. Powell's financial affairs, but was much less involved in such matters. Jt. Stip. at ¶ 17.

83. Prior to the latter part of 1988, Mrs. Young routinely performed stock basis and capital gain/loss summaries by hand and typewriter in order to organize Mr. Powell's investment and tax information. She was also solely responsible for maintaining Mr. Powell's files on tax matters, personal bills paid, and investments. Jt. Stip. at ¶¶ 12–13.

84. Prior to selling their Interco stock in late 1988, it was Mr. and Mrs. Powell's practice to physically hold stock and bond certificates, rather than to entrust their investment securities with a stockbroker under a custodial arrangement. Mrs. Young kept those certificates in a filing cabinet at the Lane Company. Jt. Stip. at ¶ 27.

85. After selling their Interco stock in late 1988, and continuing into 1989, Mr.

and Mrs. Powell consolidated their investments by transferring all of their stock and bond certificates to custodial accounts administered by Wheat First Securities, Richmond, Virginia. Mrs. Young assisted with this process by gathering up those paper instruments and sending them to Wheat First Securities with cover letters. Jt. Stip. at ¶ 28; DX 2 at 32 (Brooke).

86. The consolidation of Mr. and Mrs. Powell's investments into custodial accounts at Wheat First Securities in late 1988 and 1989 caused the amount of time that Mrs. Young had to devote to assisting Mr. Powell with his personal finances to decrease, relative to her pre–1988 time commitment. First, she no longer had to store and handle physical stock and bond certificates, as in the days when Mr. and Mrs. Powell held their investments in paper form. Second, Mrs. Young's record keeping activities diminished because she could rely upon periodic statements of account prepared by Wheat First Securities. Third, the preparation of Mr. and Mrs. Powell's income tax returns was simplified because Mrs. Young could extract data relating to the Powell's investments from the comprehensive annual statements of account that Wheat First Securities provided to its customers for tax purposes. Tr. 252, 305–309, 349 (Young).

87. From 1989 through Mr. Powell's death in June 1994, Mrs. Young devoted not more than two hours per week, on the average, to helping Mr. Powell with his personal finances. Tr. 310–311 (Young).

88. From 1988 until Mr. Powell's death in 1994, Mrs. Young was responsible for writing checks on his Central Fidelity Bank account in order to pay personal bills and investment expenditures on Mr. Powell's behalf, and transferring cash from Mr. Powell's brokerage account at Wheat First Securities to his bank accounts at Central Fidelity Bank and the First National Bank of Altavista. Jt. Stip. at ¶ 16. However,

those activities did not require a significant time commitment on Mrs. Young's part. Over the roughly six-year period between 1988 and 1994, Mrs. Young wrote 627 checks, which equates approximately to two checks per week, on average (627 checks ÷ 312 weeks = 2 checks/week). PX 50. Common sense and everyday experience instruct that it does not take more than 5 or 10 minutes to write two checks.

89. Similarly, from 1989 forward, Mr. and Mrs. Powell's Wheat First Securities brokerage accounts were not actively traded, in the sense that the Powells did not routinely engage in daily buying and selling of securities. DX 2 at 99 (Brooke). Over the roughly six-year period between 1988 and 1994, 506 transactions occurred in Mr. Powell's Wheat account, which equates to only 1.6 transactions per week, on the average (506 transactions ÷ 312 weeks = 1.6 transactions/week). PX 49. In light of the substantial role that Mr. Wheat and Ms. Brooke, Mr. Powell's stockbrokers, played in the management of the Powells' Wheat accounts, the Court finds that the sporadic investment activity in those accounts implies no significant time commitment on Mrs. Young's part.

90. From 1988 forward, Mrs. Young used computer software to generate periodic reports summarizing the information in Mr. and Mrs. Powells' Wheat account statements, in order to give them "an overall picture" of their assets. Jt. Stip. at ¶ 15; Tr. 324–325 (Young). This required no significant time on Mrs. Young's part, however, inasmuch as she only updated this report every one to two months, or sometimes longer, and that took only approximately ten minutes. Tr. 326 (Young).

91. From 1989 forward, Wheat First Securities was Mr. and Mrs. Powells' primary stock brokerage firm. Jt. Stip. at ¶ 35. Although the Powells occasionally

bought bonds from other brokerage firms, their dealings with those firms were negligible in comparison to their dealings with the Wheat firm. As noted, there were 506 transactions in Mr. Powell's Wheat account in 1988 through 1994. By comparison, the Powells made only seventeen (17) bond purchases in 1988–1994 through the brokerage firm of Scott & Stringfellow, Inc. PX 38 (Scott & Stringfellow account records for the Powells). On those occasions, Frank Rogers Vaden of Scott & Stringfellow contacted Mrs. Young by telephone whenever he knew of bonds that might be suitable for Mr. Powell's portfolio, whereupon Mrs. Young would relay that information to the Powells. Mrs. Young initiated no telephone inquiries concerning bond purchases with Mr. Vaden, however. Tr. 351–351 (Young).

92. Similarly, Mr. Powell made only three (3) bond purchases through the J.C. Bradford firm in 1988 through 1994. PX 50 at 7, 8, 13 (Central Fidelity Bank account summary showing three checks to J.C. Bradford).

93. Moreover, Mr. Powell did not maintain depositary accounts with Scott & Stringfellow and J.C. Bradford; rather, the bonds he purchased from those firms were delivered to the Wheat firm. Tr. 236–237 (Young); PX 49 at 5, 7 (Wheat summary showing incoming transfers of bonds purchased from Scott & Stringfellow and J.C. Bradford).

94. The number of checks drawn on Mr. Powell's First National Bank account in 1988–1994 was comparable to the volume of checks drawn on his Central Fidelity Bank account in those years. DX 52 (First National Bank summary); PX 50 (Central Fidelity Bank summary). However, Mrs. Young did not write checks on Mr. Powell's First National Bank of Altavista account. Rather, all of the checks drawn on that account in 1988–1994 were written by either Mr. Powell or Mrs. Powell. DX 52; Tr. 266, 324 (Young).

95. For many years, Mr. Powell maintained subscriptions to numerous investment-related publications, such as the Wall Street Journal, which both he and Mrs. Young would read. On many occasions, when Mr. Powell lost interest in a particular publication, he allowed Mrs. Young to renew the subscription if she was interested. Accordingly, out of routine habit formed over the years, Mrs. Young wrote checks on Mr. Powell's Central Fidelity account to pay for subscriptions to investment publications in 1988–1993, even after he finally lost interest in such matters in the last year or so of his life. The total cost of these subscriptions exceeded $12,000. Tr. 243–246 (Young); Jt. Stip. at ¶ 25A.

96. In 1988 through 1993, Mrs. Young read those investment publications on her own behalf, not in any capacity as Mr. Powell's "investment advisor." Tr. 302–303 (Young).

97. The Contested Payments were made solely from Mr. Powell's assets, not from Mrs. Powell's assets. Tr. 162 (Lane).

98. Even so, before making each of the Contested Payments to Mrs. Young in 1988 through 1993, Mr. Powell always consulted Mrs. Powell, who never expressed any objection to those payments. DX 2 at 67–69, 74 (Brooke); DX 42 at 12–13 (Young). Mrs. Powell was generally deferential to Mr. Powell's wishes. Tr. 162–163 (Lane); DX 42 at 12–13 (Young).

99. However, given Mrs. Powell's awareness of the Contested Payments in late 1988 and thereafter, Mrs. Young did not expect those payments to continue because she doubted that Mrs. Powell would continue to tolerate that situation. Tr. 270–273 (Young). Thus, Mrs. Young was genuinely surprised when Mrs. Powell

signed the Letter of Authorization for the last Contested Payment in December 1993, on Mr. Powell's behalf. DX 42 at 12–13 (Young); Jt. Stip. at ¶¶ 50–51.

100. Notwithstanding her doubts as to the continuation of the Contested Payments, Mrs. Young continued to help Mr. Powell with his personal finances out of gratitude for all that he had done for her over the years. By 1988, thanks to Mr. Powell's gifts of Lane Company stock over the years, Mrs. Young was financially secure and had no need to seek employment because the income from her investment portfolio exceeded her earnings while at the Lane Company. Therefore, when Mr. Powell asked on a couple of occasions whether he owed Mrs. Young anything for preparing one of his tax returns, she replied that due to his generosity over the years, Mr. Powell owed her nothing. Tr. 285, 302, 345–346 (Young); DX 39 at 4–5 (Young).

101. Mrs. Young enjoyed helping Mr. Powell in his declining years, and was thankful for an excuse to visit him regularly. Tr. 342 (Young); DX 39 at 5 (Young).

102. Although Mrs. Young continued to help with Mr. Powell's personal finances during the first half of 1994, until his death on June 25, 1994, she received no payment from the Powells in 1994. 'Despite that, Mrs. Young never considered filing a claim against Mr. Powell's estate. Jt. Stip. at ¶ 65; Tr. 346 (Young).

■ 103. Mrs. Young recalls one occasion when Mrs. Powell told her about someone who had inquired whether Mrs. Young was still "working" for the Powells. Mrs. Powell replied that Mrs. Young had never worked for the Powells; rather, Mrs. Young worked for the Lane Company, but also "took care of a few things for Hamp." DX 39 at 5 (Young).[10]

## G. Other Matters

104. On September 30, 1988, Mr. Powell executed a durable power of attorney naming Mrs. Powell and Mrs. Young as his attorneys-in-fact. Jt. Stip. at ¶ 36A; PX 62. Mr. Lane prepared that power of attorney at the request of Mrs. Young, who in turn was acting on Mrs. Powell's specific request. Tr. 117–118 (Lane), 264–265 (Young).

105. Although Mrs. Young used that power of attorney to effectuate certain of Mr. Powell's charitable gifts and to transmit shares for tender on Mr. Powell's behalf, Mrs. Young never used her power of attorney to transfer any of Mr. Powell's

**10.** Although no hearsay problem exists as to this statement by Mrs. Powell because it was offered by the Government as an admission of a party-opponent, *see* Fed.R.Evid. 801(d)(2); *Estate of Shafer v. Commissioner of Internal Revenue*, 749 F.2d 1216, 1220 (6th Cir.1984), the Court takes this opportunity to issue a formal ruling on the Government's hearsay objection to certain evidence submitted by the plaintiff relating to statements of Mr. and Mrs. Powell. At trial and through a supplemental motion in limine, the Government objected to evidence offered by the plaintiff pertaining to statements made by the Powells on the ground that such evidence is hearsay that does not qualify for any exception under the Federal Rules of Evidence. In response, the plaintiff contended that the statements of the late Mr. and Mrs. Powell were admissible under the Virginia dead man's statute, Va. Code Ann. § 8.01–397, or under various exceptions to the hearsay rule. Because federal law supplies the rule of decision in this tax case, the Virginia dead man's statute does not apply and cannot provide the basis for admitting statements of the Powells that would otherwise be hearsay. *See Phoenix Mutual Life Ins. Co. v. Adams*, 30 F.3d 554, 566 (4th Cir.1994). Furthermore, the Court is of the opinion that the Powell's statements, as proffered by the plaintiff, do not fall within any recognized exception to the hearsay rule. Thus, the Court, in reviewing the evidence in this case, did not rely on any such statements proffered by the plaintiff when offered for the truth of the matters asserted therein.

property to herself or any other individual beneficiary. Jt. Stip. at ¶ 81.

106. Warren "Dike" Cox, formerly Mr. Powell's farm manager and handyman, began acting as Mr. Powell's "personal sitter" sometime in 1991, when Mr. Powell required at-home assistance due to his poor health. However, Mr. Cox recalls that even after that time, there were periods when Mr. Powell was able to take care of himself and, thus, dispensed with Mr. Cox's assistance. Tr. 202(Cox).

107. Although Dale Hunley, a registered nurse who began providing at-home care for Mr. Powell from December of 1991 through late 1993, claimed that Mr. Powell's health steadily deteriorated throughout that time and that he was often confused, she also acknowledged that Mr. Powell's physical and mental condition varied from day to day, admitting that "[t]here were days when he was more alert than other days." Tr. 220 (Hunley). Nevertheless, Mr. Powell's deteriorating physical and mental condition eventually required him to spend the last several months of his life in the hospital.

## II. FINDINGS AS TO THE "DOMINANT REASON" FOR THE CONTESTED PAYMENTS

108. From the totality of the circumstances, as set forth above, the Court finds that Mr. Powell's "dominant reason" for making the Contested Payments was the "affection, respect, admiration, charity, or like impulses" that he felt toward Mrs. Young. *Commissioner v. Duberstein*, 363 U.S. 278, 285–86, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960) (internal quotation marks omitted).

---

109. Therefore, upon making the Contested Payments, the Court finds that Mr. Powell acted out of a "detached and disinterested generosity." *Duberstein*, 363 U.S. at 285, 80 S.Ct. 1190 (internal quotation marks omitted).

## III. FINDINGS OF FACT AS TO DEFENDANT'S COUNTERCLAIM [11]

### A. *Mr. Lane's Recharacterization of the Contested Payments*

110. At Mr. Lane's request, Wayne Hicks, CPA, now deceased, prepared a memorandum dated November 29, 1994, which purported to show the income tax, gift tax, and estate tax implications to Mrs. Powell and the late Mr. Powell if the Contested Payments were recharacterized as payments of compensation to Mrs. Young. DX 25; Tr. 45 (Hicks), 400 (Lane).[12] Wayne Hicks obtained his understanding of the facts reflected in his memo from Mr. Lane. Tr. 402 (Lane).

111. In his November 29, 1994 memo, Wayne Hicks wrote:

> To avoid the complications of employment calculations, I'm assuming that this compensation would be in the form of consultant fees rather than employee compensation to Mrs. Young. I believe such classification to be a proper one since Mrs. Young was employed full-time elsewhere during the years of the gifts.

DX 25; Tr. 400, 403 (Lane). The "complications of employment calculations" cited by Mr. Hicks pertained to the federal employment taxes that the Powells would have owed if Mrs. Young had been Mr. Powell's employee in 1988–1993. Tr. 401

---

**11.** Because the gift-compensation issue also pertains to the Government's counterclaim, some of the findings in this Part relate to that issue and, thus, also support the Court's decision as to the plaintiff's gift tax refund claim.

**12.** The late Wayne Hicks was the father and business partner of Russell Hicks, who testified at trial. Tr. 45 (Hicks). Citations herein to trial testimony attributed to "Hicks" refer to Russell Hicks's testimony.

(Lane). However, Wayne Hicks's understanding that Mrs. Young was "employed full-time elsewhere" in 1989 through 1993 was erroneous, inasmuch as she had retired from the Lane Company in March 1989. Tr. 402–403 (Lane). Mr. Lane neglected to correct Mr. Hicks's misperception. Tr. 403 (Lane).

112. Thereafter, Mr. Lane advised Mrs. Powell that she could amend her own gift tax returns for the years 1989 through 1993, in order to assert the claim that the Contested Payments in those years should be recharacterized as compensation for personal services. Jt. Stip. at ¶ 69.

113. However, due to her own declining health, and out of evident deference to her late husband's characterization of the Contested Payments as gifts,[13] Mrs. Powell declined to accept Mr. Lane's advice.

114. After Mrs. Powell's death in July 1995, Mr. Lane became the executor of her estate. Jt. Stip. at ¶ 70.

115. In his capacity as the executor of Mrs. Powell's estate, Mr. Lane retained the law firm of Gentry, Locke, Rakes & Moore to assist him in investigating the propriety of the Contested Payments. Jt. Stip. at ¶ 75; Tr. 147, 178, 376 (Lane); DX 40.

116. By letter dated June 18, 1996, Mr. Lane complimented Mrs. Young on the assistance she gave Mr. Powell in his declining years. PX 86; Tr. 260–262.

117. Thereafter, on Mr. Lane's behalf, William Kennedy, an attorney with Gentry, Locke, Rakes & Moore, sent Mrs. Young a letter dated July 1, 1996, inquiring about the Contested Payments and suggesting that her acceptance of those payments constituted self-dealing and a

breach of fiduciary duty. Jt. Stip. at ¶ 76; DX 40; Tr. 258 (Young).

118. By letter dated July 3, 1996, Mrs. Young responded to Mr. Kennedy's allegations. Writing in "a state of righteous indignation," Mrs. Young began by thanking Mr. Lane for his complimentary remarks in his letter of June 18, 1996. Tr. 259 (Young); DX 41 at 1 (Young). Continuing in that vein, Mrs. Young also took credit for the help she had given the Powells over the years. Thereafter, Mrs. Young turned to Mr. Kennedy's allegations, expressed her disagreement, explained the circumstances in which the Contested Payments were made, and stated, further, that those payments were gifts. Jt. Stip. at ¶ 77; DX 41 at 1; PX 26.

119. Mrs. Young's remarks to Mr. Lane in her letter of July 3, 1996 (DX 41 at 1) can be construed to imply that she devoted significant time and effort to Mr. Powell's affairs in 1988–1993 only if her remarks are taken out of context, without regard to her state of mind at that time and the time frame in question. Tr. 260 (Young). Specifically, in light of the accusatory tone of Mr. Kennedy's letter of July 1, 1996 (DX 40), and her resultant state of righteous indignation, she felt very much on the defensive and drafted her letter accordingly. Tr. 329–330. Thus, when she wrote of the "time and effort expended by me in building the Powells' net worth back to the pretax proceeds of the Interco liquidation," what Mrs. Young had in mind was all the help she had given the Powells over many years. Tr. 331 (Young). The Court finds that Mr. Lane and Mr. Kennedy's tactic was to goad Mrs. Young into defending the payments by showing what

---

13. Mrs. Powell's general deference to Mr. Powell's wishes is a matter of record. Tr. 162–163 (Lane). Notably, when Mrs. Powell executed the Letter of Authorization for the last Contested Payment on Mr. Powell's be-

half in December of 1993, she informed Mrs. Young that she intended to continue Mr. Powell's Christmas giving practices for as long as he was still alive. Jt. Stip. at ¶¶ 50–51.

she had done to deserve them so that they could then spin her response as an admission that she "earned" the payments.

120. On July 12, 1996, pursuant to their investigation of the Contested Payments, Mr. Lane and another of his lawyers, Michael Deneka, conducted a long-distance telephonic interview of Mrs. Young, who was at her home in Pawley's Island, South Carolina. Mr. Deneka tape-recorded that interview and prepared a typewritten transcript of Mrs. Young's remarks. In that interview, Mrs. Young again stated that Mr. Powell viewed the Contested Payments as gifts, not compensation for personal services. Jt. Stip. at ¶ 78; DX 42.

121. After the July 12, 1996 telephone interview, Mrs. Young had no further contact from Mr. Lane regarding the Contested Payments. Jt. Stip. at ¶ 79.

122. Mr. Lane's 1996 investigation of the Contested Payments uncovered no evidence of any efforts on Mrs. Young's part to deceive Mr. Powell. Tr. 180–181 (Lane); see also Tr. 382–383 (Lane admission that he failed to uncover evidence to support his theory that Mrs. Young acted fraudulently in connection with the Contested Payments).

123. Pursuant to his investigation of the Contested Payments, Mr. Lane has to date taken no legal action against Mrs. Young to recover those payments. Jt. Stip. at ¶ 80.

124. In late July 1996, Mr. Lane filed a "second round" of amended gift tax returns on behalf of the late Mrs. Powell for the years 1989 through 1994. The "second round" 1994 amended gift tax return stated a refund claim in the amount of $136,920, corresponding to the gift tax refund claim pleaded in the Complaint. Those "second round" amended gift tax returns were premised upon the recharacterization of the Contested Payments as

compensation, rather than gifts. Jt. Stip. at ¶ 71; Tr. 57 (Jones); PX 79–84.

125. The Internal Revenue Service denied the gift tax refund claim stated in the "second round" 1994 amended gift tax return, whereupon Mr. Lane brought his suit for refund. Jt. Stip. at ¶ 72.

126. In August 1996, Mr. Lane filed amended individual income tax returns (Forms 1040X) for the years 1992 and 1993 on behalf of the late Mr. and Mrs. Powell. As with the "second round" amended gift tax returns, those Forms 1040X were premised upon the recharacterization of the Contested Payments as compensation, rather than gifts. Further, the amended 1992 and 1993 income tax returns claimed that a significant portion of the alleged compensation paid to Mrs. Young was deductible from Mr. and Mrs. Powell's taxable income for those years. Jt. Stip. at ¶ 73; Tr. 373–374, 389 (Lane); DX 22, 23.

127. Upon filing the 1992–1993 amended income tax returns, as well as the "second round" amended gift tax returns, Mr. Lane was assisted by Russell Hicks, Walter Jones, another CPA formerly employed by the IRS for 27 years, and Michael Deneka, an attorney with the Roanoke firm of Gentry, Locke, Rakes & Moore. Mr. Hicks prepared the 1992–1993 Forms 1040X and the "second round" amended gift tax returns, while Mr. Jones authored a three-page narrative attachment to those amended returns that set forth the alleged factual and legal bases for the income tax and gift tax refunds sought by Mr. Lane. Tr. 31–33, 36–37, 40–41 (Hicks), 49–53, 66 (Jones), 147, 178, 375–376 (Lane); PX 18–19; DX 22–23.

128. In acquiring his knowledge of the facts and circumstances in which the Contested Payments were made, Mr. Hicks relied solely upon Mr. Lane's factual rep-

resentations and documents provided by Mr. Lane. Tr. 44 (Hicks).

129. On August 5, 1996, acting in his capacity as the executor of Mrs. Powell's estate, Mr. Lane signed the 1992–1993 amended income tax returns. Tr. 373–374, 389 (Lane); DX 22, 23.

130. Russell Hicks prepared deduction allocation worksheets which show that in preparing the 1992–1993 Forms 1040X, Mr. Lane and his advisors treated 100% of the Contested Payments in those years as compensation, rather than gifts, whereupon they allocated 85% of those payments to investment-related deductions claimed on Schedule A of Form 1040, 5% to rental deductions claimed on Schedule E of Form 1040, and 10% to nondeductible personal expenditures. Tr. 37, 41–42 (Hicks); DX 26; PX 22. In performing this allocation, Mr. Hicks relied upon Mr. Lane's representations as to the proportion of Mrs. Young's time devoted to each of these three matters. Tr. 44–45 (Hicks).

131. Inasmuch as Mr. Lane had no personal knowledge of Mrs. Young's activities on the late Mr. Powell's behalf, Mr. Lane's representations to Russell Hicks concerning the allocation of Mrs. Young's time were necessarily the product of speculation.[14] Tr. 262 (Young), 181, 384–385, 389 (Lane).

132. In response to Mr. Lane's filing of the 1992–1993 Forms 1040X on behalf of the late Mr. and Mrs. Powell, the Internal Revenue Service paid refunds of taxes, penalties, and interest to the Estate of Beverly W. Powell, in the amounts set forth below (Jt. Stip. at ¶ 74):

| Tax Year | Date Paid | Amount |
|---|---|---|
| 1992 | September 30, 1996 | $ 9,945.21 |
| 1993 | October 7, 1996 | 11,849.25 |
| Total | | $21,794.46 |

*B. Walter Jones's Role in Preparing and Filing the "Second Round" 1989–1994 Amended Gift Tax Returns and the 1992–1993 Income Tax Refund Claims*

133. On Mr. Lane's behalf, the law firm of Gentry, Locke, Rakes & Moore retained Walter Jones, CPA, to provide an opinion as to whether the Contested Payments should be characterized as gifts or compensation. Tr. 50 (Jones).

134. Mr. Jones had no prior knowledge of the circumstances in which the Contested Payments were made, and did not personally interview Mrs. Young. Tr. 67–68 (Jones). Thus, in acquiring his knowledge of the circumstances in which the Contested Payments were made, Mr. Jones relied exclusively upon Mr. Lane's factual representations and documents provided by Mr. Lane. Tr. 68–69 (Jones), 391, 394 (Lane).

135. In preparing the three-page narrative attachment to the 1992–1993 Forms 1040X (DX 22–23), Mr. Jones concluded that Mrs. Young provided "very substantial and valuable services" to Mr. Powell in 1988 through 1993. Tr. 54 (Jones). That conclusion, in turn, led Mr. Jones to conclude that the Contested Payments were compensation, not gifts. Tr. 54 (Jones).

136. When Mr. Jones concluded, in consultation with Mr. Lane, that Mrs. Young provided "very substantial and valuable services" to Mr. Powell (Tr. 54), he and Mr. Lane relied on statements contained in three documents: (1) a memo-

---

**14.** Although Mr. Hicks characterized the deduction allocation methodology reflected on the 1992–1993 Forms 1040X as being "as conservative as possible" (Tr. 39, 42), when asked to explain how an allocation that treats not less than 90% of the 1992–1993 Contested Payments as potentially deductible is "conservative," he backtracked and termed that allocation merely "reasonable." Tr. 43–44.

randum authored by Mrs. Young describing a May 1989 meeting attended by her, Mr. Wheat, Ms. Brooke, and Mr. and Mrs. Powell (PX 51); (2) Mrs. Young's letter of July 3, 1996 to William Kennedy, a lawyer with Mr. Deneka's firm (PX 26, DX 41); and (3) the typewritten transcript of the July 12, 1996 interview that Mr. Lane and Mr. Deneka conducted with Mrs. Young (PX 27, DX 42). Tr. 58–60, 68–69 (Jones), 396–397 (Lane). However, Mr. Jones conducted no analysis of the time and effort that Mrs. Young devoted to specific activities on Mr. Powell's behalf, nor did he attempt to determine the dollar value of Mrs. Young's services. Tr. 71–72 (Jones).

137. Moreover, having consulted the transcript of Mrs. Young's July 12, 1996 telephonic interview (DX 42), Mr. Jones knew that Mrs. Young had never earned more than about $30,000 per year while employed full-time at the Lane Company. Tr. 73–74 (Jones). Although Mr. Jones was aware of the disparity in value between Mrs. Young's earnings history at the Lane Company and the Contested Payments, he saw no need to make further inquiry into Mrs. Young's activities on Mr. Powell's behalf. Tr. 74–75 (Jones). Instead, on the assumption that the Contested Payments and Mrs. Young's services were equal in value, Mr. Jones concluded that the Contested Payments of $100,000 in each of the years 1988 and 1990–1993, and $298,250 in 1989, were entirely compensation. Tr. 73–74 (Jones). Mr. Jones's narrative attachment to the 1992–1993 Forms 1040X reflects that assumption.

138. In July and/or August of 1996, when Mr. Jones wrote the narrative attachment to the 1992–1993 Forms 1040X, he and Mr. Lane both knew of the following matters:

A. That over a twenty-year period, predating the 1988–1993 time frame, Mr. Powell had made substantial annual gifts to Mrs. Young. Tr. 69 (Jones), 157 (Lane).

B. That Mr. Powell had executed written Letters of Authorization, pursuant to which the Contested Payments in 1988–1992 were made, stating that the purpose of each such payment was a gift, and that Mrs. Powell had executed a Letter of Authorization in 1993 on Mr. Powell's behalf, stating that the purpose of the 1993 Contested Payment was a gift. Tr. 79–82 (Jones), Tr. 389 (Lane).

C. That Mr. Powell had reported the Contested Payments as gifts in his original 1988–1993 gift tax returns. Tr. 70 (Jones), 390 (Lane).

D. That Mrs. Young had stated, in her letter of July 3, 1996 (DX 41 at 3–4), and in her July 12, 1996 interview (DX 42 at 14), that Mr. and Mrs. Powell viewed the Contested Payments as gifts. Tr. 76–78 (Jones), 397 (Lane).

E. That Mrs. Young's letter of July 3, 1996 stated that "I did not want pay for this and told the Powells so," that she would have done "[a]nything I could for the Powells, just as I would for my own parents or other relatives," and that Mr. Powell was like a father to her and treated her like a member of the family. PX 26 at 3; DX 41 at 3; Tr. 95 (Jones), 397 (Lane).

F. That Mr. Lane had no document formalizing any arrangement between Mr. Powell and Mrs. Young involving the exchange of money for services in 1988 through 1993. Tr. 70, 76 (Jones); DX 15 at 6–8 (Lane formal admissions).

G. That Mr. Lane was unaware of any oral statements by the late Mr. Powell to the effect that it was his intention to make the Contested Payments in exchange for Mrs. Young's services. Tr. 76 (Jones); DX 15 at 9 (Lane formal admission).

139. In concluding that the Contested Payments should be recharacterized as compensation, Mr. Jones gave little or no consideration to the factors listed above. Instead, he focused exclusively on the fact that the Contested Payments were contemporaneous with the assistance that Mrs. Young gave Mr. Powell in 1988 through 1993. Tr. 87, 89, 91 (Jones).

140. On the second page of his narrative attachment to the 1992–1993 Forms 1040X, Mr. Jones cited 26 C.F.R. § 1.83–1,[15] which specifies the income tax treatment of a recipient of property "transferred in connection with the performance of services." Tr. 86 (Jones); DX 22–23. However, Mr. Jones was unable to articulate any specific facts, whether known to him in 1996 or at trial, establishing any tangible *connection* between the Contested Payments and the assistance that Mrs. Young gave Mr. Powell in 1988 through 1993. Tr. 86–87, 89 (Jones). Rather, in concluding that Treas. Reg. § 1.83–1 was applicable, Mr. Jones relied solely upon the fact that the Contested Payments were contemporaneous with Mrs. Young's assistance to Mr. Powell. Tr. 87, 89, 91 (Jones).

*C. Mr. Lane's State of Mind Upon Filing the 1992–1993 Income Tax Refund Claims*

141. Due to his general absence from the Altavista area in 1988 through 1993, Mr. Lane has no firsthand personal knowledge of the circumstances in which the Contested Payments were made, nor of the nature and extent of the assistance that Mrs. Young gave Mr. Powell in those years. Tr. 262 (Young), 181, 384–385, 389 (Lane). Therefore, Mr. Lane developed his theory that the Contested Payments were compensation, not gifts, entirely after the fact. Tr. 389 (Lane).

142. Upon signing the 1992–1993 Forms 1040X on August 5, 1996, Mr. Lane knew of no document that established the existence of an employment relationship, a contractual relationship, or an informal arrangement between Mr. Powell and Mrs. Young, pursuant to which Mr. Powell paid compensation to Mrs. Young in exchange for services that she performed in 1988 through 1993. DX 15 at 6–8; Tr. 171–177.

143. Upon signing the 1992–1993 Forms 1040X on August 5, 1996, Mr. Lane knew of no oral communication made by Mr. Powell to the effect that he made the Contested Payments to compensate Mrs. Young for services that she rendered in 1988 through 1993. DX 15 at 9.

144. Although Mr. Lane claims that the alleged magnitude of the assistance that Mrs. Young gave Mr. Powell was a factor that entered into his 1996 determination that the Contested Payments were compensation, not gifts, he has no personal knowledge of the time and effort that Mrs. Young devoted to such matters. Tr. 181, 384–385, 389 (Lane), 262 (Young).

145. Having conducted the July 12, 1996 telephonic interview with Mrs. Young, Mr. Lane knew that Mrs. Young had never earned more than about $30,000 per year while employed full-time at the Lane Company. Jt. Stip. at ¶ 78; DX 42 at 11 (Young). However, upon preparing and filing the 1992–1993 amended income tax returns in August of 1996, Mr. Lane and his advisors failed to analyze whether the value of the help that Mrs. Young gave Mr. Powell in 1988–1993 was equal to the amount of the Contested Payments. Tr. 73–75 (Jones), 385–386 (Lane). Nevertheless, Mr. Lane assumed this parity of value existed. *See* Tr. 383–384, 406.

146. Upon preparing and filing the 1992–1993 Forms 1040X in August of 1996,

---

**15.** Mr. Jones miscited this regulation as § 183.1–1.

Mr. Lane had none of the following documents, all of which he first prepared, or caused to be prepared, not earlier than October of 2000, in anticipation of the trial of this case:

A. A summary enumerating all of the transactions in Mr. Powell's Central Fidelity Bank account during 1988 through 1994. PX 50; Tr. 165–167 (Lane).

B. A summary enumerating all of the transactions in Mr. Powell's First National Bank of Altavista account during 1988 through 1994. DX 52; Tr. 167 (Lane).

C. A summary enumerating all of the transactions in Mr. Powell's Wheat First Securities brokerage account during 1988 through 1994. PX 49; Tr. 168 (Lane), 209 (Mary Cox).

147. Mr. Lane has no recollection of having contacted Frank Rogers Vaden, the Scott & Stringfellow broker who sold bonds to Mr. and Mrs. Powell in 1988 through 1993, prior to the fall of 2000. Tr. 168–170 (Lane).

148. At present, Mr. Lane takes the position that the dominant reason for the Contested Payments was, in fact, to pay Mrs. Young for services that she rendered on Mr. Powell's behalf. Tr. 156 (Lane). However, upon preparing and filing the 1992–1993 amended income tax returns with the IRS in August of 1996, Mr. Lane and his advisors failed to consider what the dominant reason for the Contested Payments was. Tr. 377–380 (Lane).

149. As a member of the Virginia bar since 1977, Mr. Lane understood that when he signed the 1992–1993 Forms 1040X on August 5, 1996 he was under a legal duty to file amended returns that were true, correct, and complete to the best of his knowledge and belief. Tr. 387–389, 393 (Lane); DX 22–23.

*D. Mr. Lane's False Representations of Material Fact on His 1992–1993 Income Tax Refund Claims*

150. Attachment 1040X–1 fails to mention the critical fact that Mr. Powell viewed the Contested Payments as gifts and characterized those payments as such on his 1988–1993 federal gift tax returns.

151. The second page of Attachment 1040X–1 repeatedly cites authorities that govern the tax treatment of property "transfers by an employer to an employee," and the like, thereby possibly implying that Mrs. Young was Mr. Powell's employee in 1988–1993.

152. The third page of Attachment 1040X–1 states that "Ms. Hudson–Young acknowledges (July '96) the nature of the services she performed during the period 1988–1993," and paraphrases certain statements that Mrs. Young made in her letter of July 3, 1996 (DX 41) and her interview of July 12, 1996 (DX 42). Attachment 1040X–1 reproduces only fragments of those statements. Moreover, the reference to Mrs. Young's alleged "acknowledg[ment] … of the services she performed during the period 1988–1993" conflicts with Mrs. Young's belief, expressed in the quoted sources, that the Contested Payments were gifts, not compensation.

*E. Mr. Lane's Intentions Upon Filing the 1992–1993 Income Tax Refund Claims*

153. Upon filing the 1992–1993 amended income tax returns, Mr. Lane intended that the Internal Revenue Service would read the three-page narrative explanation attached to each return, and in reliance upon that explanation, issue the requested income tax refunds. Tr. 375, 377 (Lane).

154. From the narrative explanation attached to the 1992–1993 Forms 1040X, which lists the amounts of the Contested Payments for each of the years 1988–1993

and states that those payments were compensation, one can reasonably infer that Mr. Lane intended to convey to the IRS that the value of the assistance that Mrs. Young gave Mr. Powell in 1988–1993 was equal to the amount of the Contested Payments. Tr. 385–386 (Lane).

*F. Internal Revenue Service Processing of Mr. Lane's 1992–1993 Income Tax Refund Claims*

155. In August of 1996, Mr. Lane filed the 1992–1993 Forms 1040X with the Internal Revenue Service's Philadelphia Service Center, also known as the Philadelphia Compliance Center.

156. When a Form 1040X is received by the Philadelphia Service Center, that return is initially processed by an IRS customer service representative. Tr. 410–411 (Failla). In accordance with written guidelines set forth in Chapter 21 of the Internal Revenue Manual (IRM), the customer service representative will routinely verify the mathematical computations in the Form 1040X, compare and reconcile that amended return to the original return, and read any explanatory attachments to the Form 1040X. Tr. 415–416 (Failla); DX 51 at 3.

157. In accordance with written guidelines set forth in IRM Chapter 21, an IRS customer service representative will refer a Form 1040X to the IMF Classification group within the IRS examination branch at the Philadelphia Service Center when that Form 1040X reflects certain "Category A criteria," or requires a technical assistance request involving a legal interpretation. DX 51; Tr. 410–413, 416–417 (Failla).

158. Examples of Category A criteria include excessive business expenses, excessive expenses on Schedule C of Form 1040, excessive rental expenses, and certain constitutional issues raised by the taxpayer. Tr. 417 (Failla).

159. The 1992–1993 Forms 1040X filed by Mr. Lane (DX 22–23) reflect no Category A criteria that would trigger an automatic referral to IMF Classification. Tr. 421 (Failla).

160. The 1992–1993 Forms 1040X filed by Mr. Lane, including the narrative explanations attached thereto, reflect no obvious mathematical errors or other inconsistencies that would alert an IRS customer service representative that further inquiry into the factual basis of those income tax refund claims was required. Tr. 427 (Failla).

161. Auditors within the IMF Classification group "classify" Forms 1040X for examination, selecting amended returns for audit. Tr. 410 (Failla). IMF Classification auditors also respond to technical assistance requests from customer service representatives in connection with amended returns requiring a legal interpretation. Tr. 410–411 (Failla). When confronted with a Form 1040X requiring a legal interpretation, an IMF Classification auditor will attempt to resolve the legal question through research. Failing that, the auditor will seek the advice of persons at higher levels of authority within the IRS, including IRS attorneys employed in District Counsel offices or even the Office of Chief Counsel. Tr. 419 (Failla).

162. The IMF Classification group is responsible only for the Form 1040 series of individual income tax returns, including Form 1040X, not returns for other federal taxes such as the gift tax. Tr. 419–420 (Failla). Consequently, an IMF Classification auditor will not attempt to resolve a legal issue relating to the gift tax that is raised in a Form 1040X; rather, the auditor will refer the matter to an IRS estate and gift tax attorney. Tr. 420 (Failla).

163. Upon receiving a Form 1040X, IRS customer service representatives do not routinely obtain and consult any other

tax returns that the taxpayer has filed, such as gift tax returns, in order to determine whether a referral to IMF Classification is required. Tr. 422 (Failla).

164. Under the routine IRS procedures described above, had the 1992–1993 Forms 1040X filed by Mr. Lane (DX 22–23) disclosed that the Contested Payments for those years were reported as gifts on Mr. Powell's previously filed 1992–1993 gift tax returns, that would have triggered a technical assistance request seeking a legal interpretation from IMF Classification, which in turn would have referred the matter to an IRS estate and gift tax attorney. Tr. 422–423 (Failla).

165. Under the routine IRS procedures described above, had the 1992–1993 Forms 1040X filed by Mr. Lane disclosed that the alleged "compensation" forming the basis for those refund claims, i.e., the Contested Payments, far exceeded any reasonable value that might be assigned to Mrs. Young's services on Mr. Powell's behalf, that discrepancy would have triggered further inquiry by the IRS. Tr. 415–416 (Failla); DX 51, page 3.

## IV. DISCUSSION

### A. Plaintiff's Refund Claim

The pivotal issue in the plaintiff's gift tax refund claim is whether the payments made by Mr. Powell to Mrs. Young are properly classified as gifts or compensation for services. In the seminal case on this issue, *Commissioner of Internal Revenue v. Duberstein*, the Supreme Court declined the Government's request to establish a bright-line test as to the gift-compensation determination and, instead, stated that the gift-compensation inquiry is one that "does not lend itself to any more definite statement that would produce a talisman for the solution of concrete cases." 363 U.S. 278, 284–85, 80 S.Ct. 1190 (1960). Rather, the decision ultimately hinges upon "application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case." *Id.* at 289, 80 S.Ct. 1190; *see also Poyner v. Commissioner of Revenue*, 301 F.2d 287, 289 (4th Cir.1962) (stating that the "trier of fact must draw from [the basic facts] his inferences as to the 'dominant reason' for the payments-the answer to the question why the payments were made"). Although the fact that a payee may have performed contemporaneous services for the payer might be significant to the gift-compensation determination, it is simply one of "the totality of the facts" that must be considered. *Duberstein*, 363 U.S. at 289, 80 S.Ct. 1190. For this Court to hold otherwise would be to create a "talisman" test of the sort specifically rejected by the Supreme Court in *Duberstein*. *See id.* at 284–85, 80 S.Ct. 1190.

When the payor is motivated by "a detached and disinterested generosity, ... out of affection, respect, admiration, charity, or like impulses" toward the payee, the payment is a gift for federal tax purposes. *Duberstein*, 363 U.S. at 285, 80 S.Ct. 1190 (citation and internal quotation marks omitted). Therefore, in making the determination as to whether a payment is a gift or compensation, "the proper criterion ... is one that inquires what the basic reason for [the payor's] conduct was in fact-the *dominant reason* that explains his action in making the transfer." *Duberstein*, 363 U.S. at 286, 80 S.Ct. 1190 (emphasis added); *see also id.* at 285, 80 S.Ct. 1190 (stating that "the most critical consideration ... is the transferor's 'intention' "). In *Poyner v. Commissioner of Internal Revenue*, 301 F.2d 287 (4th Cir.1962), the Fourth Circuit held that the *Duberstein* analysis requires a three-step inquiry. First, in determining whether a payment was a gift or compensation, "the trier of fact must make findings as to the basic facts, the actual happenings." *Poyner*, 301 F.2d at 289. Next, "the trier of fact must

draw from these basic findings his inferences as to the 'dominant reason' for the payments-the answer to the question why the payments were made." *Id.* at 289. Third, the Court "must decide whether the dominant reason, as found, for the payment is such as to require gift treatment ... or income treatment .... This question, involving the proper meaning of the statutory term 'gift,' is one of law." *Id.* at 289–90.

■ Upon applying the foregoing standard to the basic facts of this case, the Court must conclude that the Contested Payments were gifts, not compensation. Mr. Powell's exceptional generosity, his fatherly affection for Mrs. Young, his expressions of concern for her future wellbeing, his gratitude for Mrs. Young's advice in connection with the Interco stock sale,[16] his long and consistent practice of periodically making substantial gifts to Mrs. Young, his contemporaneous oral and written expressions of intention, his subsequent filing of gift tax returns reporting the Contested Payments as gifts, and the other circumstances noted above establish that Mr. Powell's "dominant reason" for making the Contested Payments was the "affection, respect, admiration, charity, or like impulses" that he felt toward Mrs. Young. *Duberstein,* 363 U.S. at 285, 80 S.Ct. 1190 (internal quotation marks omitted). That, in turn, compels the legal conclusion that the Contested Payments, as the product of Mr. Powell's "detached and disinterested generosity," were gifts "in the statutory sense." *Id.* (internal quotation marks omitted). Thus, in light of the substantial evidence demonstrating that Mr. Powell's intention was to make the

Contested Payments as gifts, the plaintiff has failed to meet his burden of proving that the Contested Payments should be recharacterized as compensation for personal services and that a refund is due for gift taxes overpaid.

### B. Government's Counter Claim

On October 13, 2000, Magistrate Judge Conrad granted the Government leave to amend its answer in order to state a counterclaim against the plaintiff under Internal Revenue Code Section 7405 to recover allegedly erroneous income tax refunds granted to the plaintiff for the 1992 and 1993 tax years. The plaintiff moved to dismiss the Government's counterclaim under Rule 12(b)(6) for failure to state a claim upon which relief could be granted. The basis of the plaintiff's argument was that the Government is not entitled to relief under its counterclaim because the statute of limitations relevant to the recovery of erroneous refunds has lapsed.

■ Internal Revenue Code Section 7405 provides that any suit for the recovery of an erroneous refund is subject to the limitations periods set forth in Internal Revenue Code Section 6532(b). According to that Section, a suit to recover an erroneous refund must be brought "within 2 years after the making of such refund, except that such suit may be brought at any time within 5 years from the making of the refund if it appears that any part of the refund was induced by fraud or misrepresentation of a material fact." I.R.C. § 6532(b). The two-year component of the statute has lapsed, so the Government can recover the allegedly erroneous refunds

---

**16.** Fairly construed in light of the totality of the circumstances, the record shows that when Mrs. Young persuaded Mr. Powell to sell his Interco stock, she acted not as a compensated investment advisor, but as his friend and surrogate daughter. Therefore, Mr. Powell's gratitude for Mrs. Young's informal advice is most appropriately classified among the "affection, respect, admiration, charity, or like impulses" that give rise to a gift for tax purposes. *Duberstein,* 363 U.S. at 285, 80 S.Ct. 1190 (internal quotation marks omitted).

only if it can take advantage of the five-year component by showing that the refunds were induced by fraud or misrepresentation of material fact. Since the Government does not allege that Mr. Lane committed any fraud in requesting the 1992–1993 refunds, the issue becomes whether the Government can recover under its counterclaim on the basis of a misrepresentation of material fact made by Mr. Lane. For reasons explained in a previous memorandum opinion, entered February 1, 2001, the Court held that the Government had at least stated a claim for recovery of erroneous refunds under Section 7405 of the Internal Revenue Code. However, in that same memorandum opinion, the Court also held that, in order to take advantage of the five-year limitations period offered by Section 6532(b), the Government would have to prove that Mr. Lane made intentional or knowing misrepresentations of material fact in connection with the amended returns. *See United States v. Northern Trust Co.*, 93 F.Supp.2d 903, 909 (N.D.Ill.2000) (requiring that the misrepresentation be knowing or intentional). After hearing the evidence presented at trial, the Court finds that the Government has not met its burden of proving that Mr. Lane made an intentional or knowing misrepresentation of fact; thus, the Government is not entitled to take advantage of the five-year statute of limitations under Section 6532(b). As a result, the Court must dismiss the Government's counterclaim.

In light of the Court's findings and conclusions with regard to the gift-compensation issue, it follows that the 1992–1993 income tax refunds that were paid to Mr. Lane in September and October 1996 were paid in error because Mr. Lane's claims for refund rested on the mistaken premise that the 1992–1993 Contested Payments were not gifts, but deductible compensation. *See* 26 C.F.R. § 1.162–9 (providing that gifts are nondeductible from taxable income). Nevertheless, the Court cannot award judgment in favor of the Government as to its counterclaim because the counterclaim is time-barred by the expiration of the two-year statute of limitations under 26 U.S.C. § 6532(b). After evaluating the evidence at trial and making the above findings of fact pertaining to the counterclaim, the Court finds that the Government has failed to prove by a preponderance of the evidence that Mr. Lane's false statements of fact on Attachment 1040X–1 were "intentional or knowing misrepresentations of material fact"; therefore, the five-year statute of limitations under § 6532(b) is unavailable.[17]

## V. CONCLUSIONS OF LAW

1. The Contested Payments were gifts within the meaning of the Internal Revenue Code.

2. The Government is entitled to judgment on the claims alleged in the plaintiff's Complaint; therefore, the Complaint must be dismissed.

3. Because of the Government's failure to meet its burden of proving the applicability of the five-year statute of limitations under Section 6532(b) of the Internal Revenue Code, the Government's counterclaim under Section 7405 of the Internal Revenue Code to recover erroneous income tax refunds granted to the plaintiff for the 1992 and 1993 tax years must be dismissed as time barred under the applicable two-

---

17. In addition, as explained in the Court's February 1, 2001 memorandum opinion, the Court remains of the opinion that the Mr. Lane's descriptions of the Contested Payments as compensation rather than gifts were legal characterizations and not patent misrepresentations of material fact that compel, as a matter of law, the application of the five-year statute of limitations under § 6532(b).

year statute of limitations. *See* I.R.C. § 6532.

The Clerk of the Court is hereby directed to send a copy of this memorandum opinion and the attached order to all counsel of record.

### ORDER

For the reasons stated in the attached Memorandum Opinion, it is this day

### ADJUDGED AND ORDERED

as follows:

(1) the plaintiff's Complaint shall be, and hereby is, DISMISSED; and

(2) the defendant's Counterclaim shall be, and hereby is, DISMISSED.

The Clerk of the Court is hereby directed to send a copy of this Order and attached Memorandum Opinion to all counsel of record and to strike this case from the docket of this Court.